UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TRUSTEES OF INDIANA UNIVERSITY, FRED H. CATE, and its research faculty, DR. BRUCE LAMB and DR. DEBOMOY LAHIRI, <br><br> Plaintiffs, <br><br> v. <br><br> PROSECUTOR OF MARION COUNTY INDIANA, in his official capacity, and PROSECUTOR OF MONROE COUNTY, in his official capacity, <br><br> Defendants. | Case No. 1:16-cv-1289-JMS-DML |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF / NOTICE OF CHALLENGE TO CONSTITUTIONALITY OF INDIANA STATUTE

### PARTIES

1. The Board of Trustees of Indiana University ("IU") is a body politic under the laws of the state of Indiana. IU brings this action on its own behalf and on behalf of its affected employees and students.

2. Fred H. Cate, J.D., is IU's Vice President for Research. Cate is responsible for and has authority over all aspects of IU's research university-wide, including obtaining grant funding, research compliance, scientific integrity, and administration of grants.

3. Dr. Bruce Lamb, Ph.D., is a professor of Medical and Molecular Genetics at the Indiana University School of Medicine. He holds the Roberts Family Chair in Alzheimer's Disease Research and serves as the Executive Director of Stark Neurosciences Research Institute ("Stark").

1

US.106695020.03

4. Dr. Debomoy Lahiri, Ph.D., is a professor of psychiatry and a Primary Investigator for Stark Neurosciences Research Institute.

5. Stark Neurosciences Research Institute is located in Marion County, Indiana. Faculty researchers from various academic departments of Indiana University are located in Marion County and Monroe County, Indiana.

6. The Prosecutor of Marion County, Indiana, is the duly elected prosecutor of the county in which IU facilities that perform fetal tissue research are located and the prosecutor is responsible for prosecuting crimes occurring in Marion County. He is sued in his official capacity and is designated by his official title pursuant to Fed. R. Civ. P. 17(d).

7. The Prosecutor of Monroe County, Indiana, is the duly elected prosecutor of the county in which IU facilities that perform fetal tissue research are located and the prosecutor is responsible for prosecuting crimes occurring in Monroe County. He is sued in his official capacity and is designated by his official title pursuant to Fed. R. Civ. P. 17(d).

**JURISDICTION AND VENUE**

8. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

9. This Court has jurisdiction over the state-law claims alleged herein under 28 U.S.C. § 1367.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

11. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57 of the Federal Rules of Civil Procedure.

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

US.106695020.03

## LEGAL AND FACTUAL BASIS FOR CLAIMS

13. Current Indiana law allows persons to knowingly or intentionally purchase or sell a fetus to be used for adult or fetal stem cell research. Ind. Code § 35-46-5-3(b), (c)(2) ("human organism statute").

14. While the term "fetus" is not defined within the human organism statute, elsewhere in Title 35 (Indiana's criminal law title), fetus is defined as "a fetus that has attained viability". Ind. Code § 35-31.5-2-132.

15. Thus, the human organism statute permits a viable fetus to be used for adult or fetal stem cell research, whereas other prohibited uses of viable fetuses constitute the level five felony of "unlawful transfer of a human organism." Ind. Code § 35-46-5-3(b), (c)(2).

16. The recently enacted Indiana House Enrolled Act No. 1337 ("Enrolled Act") leaves the existing human organism statute unchanged, but adds a second level five felony ("unlawful transfer of fetal tissue") for anyone who "intentionally acquires, receives, sells, or transfers fetal tissue," defined as "tissue, organs, or any other part of an aborted fetus." Ind. Code § 35-46-5-1.5 ("fetal tissue statute").

17. That is, while one may lawfully purchase or sell an entire viable fetus for adult or fetal stem cell research, one may not, under the Enrolled Act, acquire, receive, sell, or transfer fetal *tissue*, whether or not the aborted fetus from which it is derived was viable.

18. The fetal tissue statute is broader than the unlawful transfer of a human organism statute in three ways.

19. First, the fetal tissue statute applies to any part of an aborted fetus (including fetal tissue), rather than only an entire fetus. Second, the fetal tissue statute applies whether or not the fetus from which the tissue is derived is viable. Third, the fetal tissue statute contains no exceptions for stem cell research or research of any type.

20. Another difference between the statutes is that the human organism statute requires purchase or sale, whereas the fetal tissue statute is violated through sale as well as noncommercial transmissions, including acquiring, receiving, or transferring.

**Indiana University's Fetal Tissue Research at Stark**

21. IU and Dr. Lahiri currently conduct no research on whole, intact, fetuses from any stage of viability. IU and Dr. Lahiri do conduct research using fetal tissue that it acquires and receives from the Birth Defects Research Laboratory at the University of Washington ("U. Wa. Lab"). The U. Wa. Lab advises that fetal tissue is obtained from both elective abortions and miscarriages.

22. From that fetal tissue, Dr. Lahiri derives mixed cell cultures that form the basis of his research in Alzheimer's disease. Dr. Lahiri is involved with multiple ongoing collaborative research projects and educational initiatives, including the NIH-funded Alzheimer's Disease Center (one of 30 funded nationally). As one aspect of his research, Dr. Lahiri has done a great deal of work on biochemical contrasts between autism spectrum disorder (ASD) and Alzheimer's disease.

23. Dr. Lahiri also derives mixed cell cultures from fetal tissue for use by collaborators across IU and at other institutions. That work is performed at Dr. Lahiri's laboratory.

24. IU and Dr. Lamb, as director of Stark, also possess in many of its laboratories "biologicals" (such as RNA, DNA, and proteins) that may potentially have been derived from fetal tissue. Some of these biologicals have been stored in a frozen state by IU for many years. It would be impossible to ascertain the initial derivation for most if not all of these biologicals.

US.106695020.03

### Indiana University's Cell Line Research

25. Faculty researchers from various academic departments of IU perform research using various "cell lines," including NIH-approved cell lines.

26. Upon information and belief, certain of those cell lines were initially derived from aborted fetal tissue. At least some of those cell lines have been in existence for over 40 years.

27. IU currently estimates that approximately 20 faculty researchers are performing research using cell lines that are derived from aborted fetal tissue. These faculty are from the following academic departments: psychological and brain sciences, medical sciences, chemistry, public health, biology, medicine, pediatrics, and optometry.

28. IU's research into whether additional faculty perform research using fetal tissue or derivatives of fetal tissue is ongoing.

29. IU is concerned that the fetal tissue statute will criminalize research performed using cell lines derived from aborted fetal tissue.

### Indiana University's Vector Production Facility

30. One important and unique feature of the cells generated through these long-standing cell lines is the cells' ability to take up DNA at very high efficiency, allowing scientists to study genes within a cell. This quality has been recognized as key to the production of gene therapy products aimed at curing a large number of human diseases.

31. IU houses the IU Vector Production Facility ("VPF"). The VPF uses cell lines that were initially derived from aborted fetal tissue to create "gene therapy vectors."

32. "Vectors" are engineered by stripping viruses of their pathogenic DNA and replacing it with gene(s) that can replace defective genes or confer anti-cancer properties. Gene

therapy vectors can only be manufactured in living cells and by far the most effective system available is the system based on the "HEK293" cell line.

33. Upon information and belief, the HEK293 cell line was derived from aborted fetal tissue.

34. Many patients are currently treated for cancer and genetic diseases using gene therapy vectors.

35. For over 20 years, VPF has generated vector products to supply clinical material to patients throughout the US and Europe.

36. The IU VPF is recognized world-wide as a leader in gene therapy.

37. NIH-funded research throughout the world relies upon vectors developed at VPF.

38. Manufacturers of gene therapy vectors are challenged to meet the demand for vectors because this technology allows a treatment option to a large number of patients who have no viable treatment alternative. Disabling VPF from manufacturing vectors using the HEK293 cell line would severely limit VPF's ability to manufacture vectors.

39. The main goal of the NIH funding IU receives in connection with the VPF is to produce and ship vector to third parties for use in gene therapy research. The fetal tissue statute will require VPF to substantially limit or cease its vector production. This will result in a significant loss of revenue and also will eliminate two decades of IU's leadership in this area.

40. There are a variety of circumstances under which IU, its faculty, Dr. Lahiri, VPF, or Dr. Lamb, as director of Stark, may need to "transfer" cells or biologicals that were derived from fetal tissue.

41. As a condition of most NIH grants, IU, its faculty, Dr. Lahiri, and Dr. Lamb, as director of Stark, must agree to retain the samples used in its research. IU, its faculty, Dr. Lahiri,

and Dr. Lamb, as director of Stark, must also agree to share those samples upon request with the NIH or other institutions that are interested in reproducing or authenticating IU, its faculty, or Dr. Lahiri's research results. If IU, its faculty, Dr. Lahiri, or Dr. Lamb, as director of Stark, are unable to comply with NIH's requirements with respect to sharing tissue samples and/or cells derived from such samples for purposes of affirming the reproducibility of research results without violating Indiana law, IU, its faculty, and Dr. Lahiri's eligibility for NIH funding is likely to be severely limited. IU its faculty, and Dr. Lahiri may also potentially have to refund millions of dollars in existing research grants.

42. When researchers join or separate from IU, they transfer their laboratory materials with them. Therefore, even were IU faculty to stop doing research in the state of Indiana as a result of the Enrolled Act, they run the risk that the mere act of transferring his research to another institution would constitute a felony.

43. IU is required in some circumstances to transfer materials, that may include cells or other materials derived from fetal tissue, in connection with legal obligations to the Office of Research Integrity of the United States Department of Health and Human Services.

44. At the most literal level, IU, its faculty, Dr. Lahiri, and Dr. Lamb, as director of Stark, must "transfer" fetal tissue within and among its laboratories. And, as a stated expectation of the VPF grant, IU is expected to ship vector to third parties for use in gene therapy research.

45. IU, its faculty, Cate, Dr. Lahiri, and Dr. Lamb, as director of Stark, are unable to discern which, if any, of their current research activities, are prohibited by the Enrolled Act. To the extent the Enrolled Act criminalizes ongoing research, it impairs IU faculty's academic freedom to perform research into important matters of public health.

7

46. The Enrolled Act by its terms does not apply to material derived from embryonic stem cells that do not come from an aborted fetus.

47. The Enrolled Act's burdens on IU, its faculty, Cate, Dr. Lahiri, VPF, and Dr. Lamb, as director of Stark far outweigh any benefit to the State of Indiana.

48. Cate and Dr. Lamb are responsible for attracting research faculty to IU and IU's Stark Neurosciences Research Institute. They have significant concerns that the Enrolled Act's limitations on academic research using fetal tissue and cells derived from fetal tissue will deter potential candidates from coming to Indiana to join IU and Stark.

49. In addition, Cate and Dr. Lamb believe that the negative impact on IU and Stark's research would be dramatic and lead to difficulties in renewing the NIH-funded Alzheimer's Disease Center that would be catastrophic for both Stark and research more generally at Indiana University and the Indiana University School of Medicine.

50. Cate, Dr. Lamb, and Dr. Lahiri also believe that the Enrolled Act will slow the pace of research using fetal tissue, which could delay an important breakthrough in treatments and cures to patients with a variety of debilitating neurological and other disorders.

## LEGAL CLAIMS

51. The Enrolled Act's criminalization of acquiring, receiving, selling, or transferring fetal tissue is unconstitutionally vague.

52. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue place an excessive burden on interstate commerce which is not outweighed by any benefit of the Enrolled Act.

53. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue violate IU faculty's and Dr. Lahiri's First Amendment right to academic freedom with respect to research on matters of public concern.

54. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue violate the IU faculty's and Dr. Lahiri's rights to equal protection under the 14th Amendment of the United States Constitution.

55. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue violate IU faculty's and Dr. Lahiri's rights of free interchange of thought and opinion and their rights to speak, write, and print freely under Article I, Section 9 of the Indiana Constitution.

56. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue violate IU faculty's and Dr. Lahiri's rights to liberty and pursuit of happiness under Article I, Section 1 of the Indiana Constitution.

57. The Enrolled Act's restrictions on acquiring, receiving, selling, or transferring fetal tissue violate IU faculty's and Dr. Lahiri's rights to equal privileges and immunities under Article I, Section 23 of the Indiana Constitution.

58. To the extent that the Enrolled Act prohibits transfers of fetal tissue in connection with IU's obligations under the authority of the federal Office of Research Integrity, it is preempted by 42 U.S.C. § 289b and other federal regulations.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiffs request that this Court:

1. Accept jurisdiction of this case and set it for hearing at the earliest opportunity.

2. Declare House Enrolled Act 1337 is unconstitutional to the extent it:

   a. Criminalizes intentionally acquiring, receiving, selling, or transferring fetal tissue used for research purposes. Ind. Code § 35-46-5-1.5.

3. Declare House Enrolled Act 1337 in part preempted by federal law.

9

4. Enter a preliminary injunction, later to be made permanent, against defendants from enforcing Indiana Code Ind. Code § 35-46-5-1.5 (eff. July 1, 2016).

5. Award plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

6. Award all other proper relief.

Respectfully submitted,

FAEGRE BAKER DANIELS LLP

____*s/ A. Scott Chinn*_____
A. Scott Chinn, #17903-49
Anne K. Ricchiuto, #25760-49
Juliana Yanez, #32201-53
FAEGRE BAKER & DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204-1750
Tel:  (317) 237-0300
Fax:  (317) 237-1000
scott.chinn@faegrebd.com
anne.ricchiuto@faegrebd.com
juliana.yanez@faegrebd.com

*Attorneys for Plaintiffs Board of Trustees of Indiana University, Fred H. Cate, Dr. Bruce Lamb, and Dr. Debomoy Lahiri*

10

**CERTIFICATE OF SERVICE**

I, A. Scott Chinn, counsel for Plaintiffs, certify that, on June 5, 2016 a copy of the foregoing Amended Complaint was filed with the Clerk and served through the Court's electronic filing system.

I further certify that all parties required to be served have been served.

<em>/s/ A. Scott Chinn</em>_____

11
US.106695020.03