UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| FRED H. CATE and its research faculty, | ) | |
| DR. BRUCE LAMB, and | ) | |
| DR. DEBOMOY LAHIRI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-01289-JMS-DML |
| | ) | |
| PROSECUTOR OF MARION COUNTY | ) | |
| INDIANA in his official capacity, | ) | |
| PROSECUTOR OF MONROE COUNTY | ) | |
| INDIANA in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case is the latest in a series of challenges to various statutory provisions that were enacted as part of House Enrolled Act 1337. This Act codified a number of abortion-related provisions, some civil and some criminal. In this action, Plaintiffs the Trustees of Indiana University, Fred Cate, Dr. Bruce Lamb, and Dr. Debomoy Lahiri (collectively "IU") challenge a provision that criminalizes the acquisition, receipt, sale, and transfer of aborted fetal tissue. IU moves for summary judgment, arguing that the provision violates the United States and Indiana Constitutions, based on five different constitutional challenges. Defendants, the prosecutors of Marion and Monroe counties, cross-move for summary judgment, contending that the statute does not offend the Constitution. Also pending before the Court is Defendants' Motion for Oral Argument regarding the cross-motions for summary judgment. [Filing No. 80.] For the reasons described below, the Court concludes that the provision violates the Due Process Clause of the United States Constitution. It therefore grants in part IU's Motion for Summary Judgment. [Filing

1

No. 77.]  Having concluded that the Court can resolve the summary judgment motions based on the parties' briefing, the Court denies Defendants' Motion for Oral Argument.  [Filing No. 80.]

# I.
## BACKGROUND

Indiana University, its School of Medicine, and various Research Institutes housed at IU conduct scientific research into Alzheimer's disease and other disorders.[1]  [Filing No. 77-3 at 6; Filing No. 77-4 at 4-5.]  IU's Alzheimer's Disease Center ("the Center") receives funding from the National Institutes of Health ("NIH") to advance research into Alzheimer's disease.  [Filing No. 77-3 at 20.]  The Center is supported by and overlaps with IU's Stark Neurosciences Research Institute ("the Stark Institute"), which is an interdepartmental research institute with ongoing research into Alzheimer's disease and other disorders.  [Filing No. 77-4 at 4-5; Filing No. 77-4 at 22.]  Plaintiff Bruce Lamb is the Director of the Stark Institute.  [Filing No. 77-4 at 4-5; Filing No. 77-4 at 22.]  IU's School of Medicine also houses the National Cell Repository for Alzheimer's disease.  [Filing No. 77-3 at 12.]  IU also hosts an NIH-funded Vector Production Facility ("VPF"), which creates cell line vectors.  [Filing No. 77-2 at 2.]

Plaintiff Debomoy Lahiri is a tenured professor in the IU School of Medicine's Department of Psychiatry, a member of the Stark Institute, and an executive committee member of the Center.  [Filing No. 77-5 at 1; Filing No. 77-6 at 25; Filing No. 77-1 at 6.]  Dr. Lahiri conducts research on brain disorders, including dementia and Alzheimer's disease.  [Filing No. 77-5 at 2.]  He is the Editor-in-Chief of the Journal of Current Alzheimer's Research, [Filing No. 77-5 at 3], and he has authored or contributed to over 300 publications, [Filing No. 77-5 at 2].  Dr. Lahiri began using fetal tissue in his research on or about July 14, 2011.  [Filing No. 77-5 at 6; Filing No. 77-6 at 2-

---

[1] Plaintiff Fred Cate is IU's Vice President for Research.  [Filing No. 77-1 at 3.]

3.] He uses fetal tissue because it contains all of the components of the fetal brain, such as neurons, astrocytes, microglia, and blood vessels, and because healthy fetal brain tissue serves as a "control" to understand how a diseased brain differs from a healthy one. [Filing No. 77-6 at 17; Filing No. 77-8 at 11; Filing No. 77-5 at 8.]

IU obtains fetal tissue for Dr. Lahiri's research from the Birth Defects Research Lab ("BDRL") at the University of Washington, and it has received approximately 25 shipments of fetal tissue from BDRL. [Filing No. 77-5 at 4; Filing No. 77-5 at 14; Filing No. 77-6 at 4.] IU pays BDRL $200 per shipment to cover the shipping and handling costs associated with obtaining the tissue; there are no additional costs. [Filing No. 77-5 at 15; Filing No. 79-2 at 17.] BDRL does not provide intact organs—instead, it sends tissue from organs, such as brains, livers, and kidneys. [Filing No. 77-5 at 3.] The amount of tissue per shipment that IU receives is small enough to be contained within roughly two teaspoons of liquid media. [Filing No. 77-5 at 15.]

After receiving a shipment of tissue from BDRL, Dr. Lahiri cuts the tissue into very small pieces. [Filing No. 77-6 at 5.] To that tissue, he adds an enzyme that dissociates, or breaks apart, the tissue's cells. [Filing No. 77-6 at 5.] He then places that mixture into a centrifuge, in order to separate the cells from "debris." [Filing No. 77-6 at 5-6.] Debris includes cells that did not successfully dissociate, as well materials such as cell membranes and tissue walls. [Filing No. 77-6 at 5-6.] The debris is discarded, and the remaining cells are classified and their viability determined. [Filing No. 77-6 at 6.] The viable cells of the desired types are plated in dishes containing different types of media, where they grow and divide for days or weeks. [Filing No. 77-6 at 6.] Dr. Lahiri then performs his research using those cells. [Filing No. 77-6 at 7.] Dr. Lahiri stores the molecules derived from his cultures in a freezer for reuse. [Filing No. 77-5 at 18.]

3

Researchers at IU also perform research using "cell lines" that have been derived from fetal tissue. [Filing No. 77-2 at 2.] When cells are plated, they may continue to grow and divide over a period of time. Cells multiply by division, and when a cell divides, it gives rise to two "daughter" cells. [Filing No. 77-8 at 7.] Those cells continue to grow and divide in the plates in which they have been placed, until they become "confluent," or evenly coat the surface of the dish such that no more cells can grow. [Filing No. 77-8 at 6.] At that point, the cells are transferred to a bigger dish or multiple dishes (or half of the cells are discarded) in order to create more room for the cells to continue to divide. [Filing No. 77-8 at 6.] This transfer process is referred to as a "passage," and researchers track the number of passages that a group of cells has undergone. [Filing No. 77-8 at 6.] In each passage, some cells will fail to divide, and will proceed intact to the next passage. [Filing No. 77-8 at 22.] Cell lines within the early series of passages are commonly referred to as "primary cell lines." [Filing No. 77-8 at 6.]

Some cells continue to divide after multiple passages, and if they are continuously cultivated, those cells eventually become known as "established" or "immortalized" cell lines, which can "be passaged more or less indefinitely." [Filing No. 77-8 at 5-6.] Established cell lines can be purchased from commercial sources or acquired from not-for-profit cell line banks, and they are used for a variety of purposes and passed from lab to lab. [Filing No. 77-8 at 5; Filing No. 77-7 at 4.] A cell line known as HEK 293 is an example of such a commercially available, established cell line, and is used by researchers at IU. [Filing No. 77-8 at 5; Filing No. 77-1 at 15.] HEK 293 originated in 1972, and the owner of that cell line represents that it was derived from an aborted fetus. [Filing No. 77-1 at 5-6.] It is used for a variety of research purposes, and is one of the most widely used cell lines in the world. [Filing No. 77-1 at 6; Filing No. 77-1 at 15.]

Researchers at IU also extract, use, and store components of cells—known as biologics or biologicals—such as DNA, RNA, and proteins.  [Filing No. 77-3 at 8-9.]  Many of those materials are stored indefinitely in freezers on IU's campuses.  [Filing No. 77-4 at 9.]

On March 24, 2016, House Enrolled Act 1337 was signed into law, becoming effective on July 1, 2016.  Among other provisions, that Act codified a subsection entitled "Unlawful transfer of fetal tissue; unlawful collection of fetal tissue."  Ind. Code § 35-46-5-1.5.  That section, in its entirety, reads as follows:

> (a) As used in this section, 'aborted' means the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus. The term includes abortions by surgical procedures and by abortion inducing drugs.
> (b) As used in this section, 'fetal tissue' includes tissue, organs, or any other part of an aborted fetus.
> (c) This section does not apply to the proper medical disposal of fetal tissue.
> (d) A person who intentionally acquires, receives, sells, or transfers fetal tissue commits unlawful transfer of fetal tissue, a Level 5 felony.
> (e) A person may not alter the timing, method, or procedure used to terminate a pregnancy for the purpose of obtaining or collecting fetal tissue. A person who violates this subsection commits the unlawful collection of fetal tissue, a Level 5 felony.

Ind. Code § 35-46-5-1.5.  Indiana Code Section 35-50-2-6(b) provides that "[a] person who commits a Level 5 felony (for a crime committed after June 30, 2014) shall be imprisoned for a fixed term of between one (1) and six (6) years, with the advisory sentence being three (3) years. In addition, the person may be fined not more than ten thousand dollars ($10,000)."

On May 25, 2016, IU filed a Complaint in this Court against the prosecutors of Marion and Monroe counties, alleging that Indiana Code § 35-46-5-1.5 violates the constitutions of the United States and the State of Indiana.  [Filing No. 1.]  IU filed the operative Second Amended Complaint on September 13, 2016. [Filing No. 47.]  The Court granted the parties' stipulated dismissal of certain Indiana state constitutional claims, leaving one state and five federal constitutional claims remaining for resolution.  [Filing No. 85.]  IU moves for summary judgment, arguing that Ind.

5

Code § 35-46-5-1.5: (1) violates the Dormant Commerce Clause of the United States Constitution; (2) violates the Equal Protection Clause of the Fourteenth Amendment (and the Equal Privileges and Immunities Clause of the Indiana State Constitution); (3) violates the Due Process Clause of the Fourteenth Amendment in that it is impermissibly vague; (4) constitutes an unconstitutional regulatory taking in violation of the Fifth Amendment; and (5) violates the First Amendment by abridging IU's academic freedom. [Filing No. 78 at 10.] Defendants cross-move for summary judgment, arguing that the statute satisfies all constitutional demands. [Filing No. 81 at 13-14.] Those Motions are now fully briefed and ripe for the Court's review.

## II.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of*

*Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id*. at 648.

### III.
### DISCUSSION

IU raises five distinct constitutional challenges to Ind. Code § 35-46-5-1.5, each of which Defendants oppose.  The Court reorders and addresses each challenge.

#### A. Due Process Clause – Void for Vagueness

##### *1. Due Process and Void-for-Vagueness Challenges*

The Fifth Amendment to the United States Constitution provides that "[n]o person shall…be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Supreme Court precedent has long established "that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2015) (citation omitted).  "The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process." *Id.* (internal quotation and citation omitted).

To satisfy the demands of due process, "a penal statute [must] define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)).

"The Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties because the consequences of imprecision are more severe." *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)).

IU argues that Ind. Code § 35-46-5-1.5 violates both aspects of the void-for-vagueness inquiry, (though violation of one is sufficient to establish a statute's vagueness), by both failing to define the criminal offense with sufficient definiteness and by failing to define the offense in a manner that does not encourage arbitrary and discriminatory enforcement.  The Court considers each in turn.

### 2. What Conduct is Prohibited

IU contends that the statute is unconstitutionally vague because it "does not define the criminalized conduct with sufficient definiteness that ordinary people can understand what conduct is prohibited."  [Filing No. 78 at 41.]  IU takes issue both with the statutory provisions regarding what material is subject to the statute's reach, [Filing No. 78 at 42], and with those provisions regarding the specific activities that are prohibited, [Filing No. 78 at 41].  Defendants respond that the statute is sufficiently definite to provide adequate notice as to what conduct is prohibited. [Filing No. 81 at 44.]

### a. "Any other part"

Subsection (b) of the statute specifies that "[a]s used in this section, 'fetal tissue' includes tissue, organs, or *any other part* of an aborted fetus."  Ind. Code § 35-46-5-1.5(b) (emphasis added).  IU contends that the statutory phrase "any other part" is unconstitutionally vague, "because it provides minimal guidance as to what material is subject to the Statute's prohibitions." [Filing No. 78 at 42.]  IU argues that persons of ordinary intelligence "will struggle to understand

what is included in the universe of items deemed 'any part of' a fetus, such as the placenta, umbilical cord, cells, biologicals derived from cells, RNA, DNA, proteins, and so on." [Filing No. 78 at 42.] Defendants respond that (1) the parties and their experts agree as to what materials "any other part" includes, [Filing No. 81 at 47]; and (2) IU is adequately on notice as to what conduct is prohibited, [Filing No. 90 at 9].

First, Defendants argue that the statute is not vague because the parties and their experts agree as to what materials "any other part" encompasses—in other words, the parties and their experts agree as to the meaning of the statutory term. But the interpretation of a statute is a question of law that is appropriately in front of the Court to decide. *See, e.g., U.S. v. Rosenbohm*, 564 F.3d 820, 822 (7th Cir. 2009) ("The interpretation of a statute is a question of law."); *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (concluding that, regarding the admission of expert testimony, "[t]he 'expert' would have testified about the meaning of the statute and regulations. That's a subject for the court, not for testimonial experts. The only legal expert in a federal courtroom is the judge.") Neither the parties' agreement, nor any expert opinions, are determinative of the meaning of the statute.

To the extent that Defendants argue that the experts' or parties' agreement constitutes persuasive evidence as to the statute's clarity (or lack of vagueness), Defendants are incorrect in asserting that the parties or their experts are in agreement. Defendants contend that the "undisputed evidence is that the smallest distinguishable part of a fetus is a cell," presumably implying, though not explicitly stating, that the statutory term "any other part" applies only to materials that are cells, or of a size larger than cells. [Filing No. 90 at 18.] IU, however, has asserted with evidentiary support that the term "part of" does not have a discernable meaning from a scientific perspective,

and that a person of ordinary intelligence could not determine what materials are considered "any other part" of a fetus.

Among other relevant points that are discussed further below, IU submitted the following testimony, for example, given by Dr. Larry Goldstein:

> **Q**: So 'part of' you find vague?
>
> **A**: Yeah, I mean, I think that's a difficult—again, it's not a scientific term that has any meaning…"

[Filing No. 77-8 at 29-30.]  And it submitted the following testimony given by Dr. Lamb:

> **Q**: And the discussion that the statute is prompting all of us to have with these words 'part of' in it, is that a designation that science uses?
>
> **A**: No. 'Part of' is not a very precise scientific term. …It's certainly not a scientific designation.  So when I read 'part of an aborted fetus,' I just assume that anything that is part of the fetus or was derived from the fetus is being referred to by that language.

[Filing No. 77-4 at 15.]  Nowhere in its briefing does IU agree with Defendants' assertion that the term "any other part" includes only cells and materials larger than cells.

The Court therefore turns to the question of whether the statutory term "any other part" provides sufficient definition such that a person of ordinary intelligence could understand what conduct is prohibited.  *See Skilling*, 561 U.S. at 402-03.  The subsection in which this term appears reads as follows: "[a]s used in this section, 'fetal tissue' includes tissue, organs, or any other part of an aborted fetus."  Ind. Code § 35-46-5-1.5(b).  The statute itself does not define the term "any other part."  The Court begins, then, by assessing the plain text of the statute, as suggested by Defendants.  In defining the term fetal tissue, the statute lists a series of covered materials: tissue, organs, and "any other part."  The statute's listing of tissue and organs indicates that materials beyond an intact fetus are covered by the statute—if they weren't, specifically listing tissue and organs would be unnecessary.  Therefore, the statute applies to tissues and organs, whether or not

11

they are situated within an intact fetus.  The same, then, is true of the catch-all final item in the series—the "any other part" term.  This means that "any other part" must include (1) materials that are not either tissues or organs, and that (2) may exist outside of an intact fetus.  This is the entirety of plain-text meaning the Court can discern from the statute.

IU argues that this definition is not sufficient to put individuals on notice as to what behavior is prohibited.  It points to a variety of materials that it uses in its research activities as examples of the types of materials that the statutory language could encompass, but does not define, such as: placentas, umbilical cords, cells, cell lines, and biologicals derived from cells, including RNA, DNA, and proteins.  [Filing No. 78 at 42.]  IU also argues that Defendants' own representations regarding what materials are encompassed by the term "any other part" illustrate the problematic vagueness of the statutory provision.  [Filing No. 84 at 47-50.]  IU argues that Defendants' representations are both facially vague and inconsistent with one another.  [Filing No. 84 at 47-50.]

For example, in their Statement of Defenses, Defendants made the following representations about the "conduct engaged in by Plaintiffs which is not prohibited by the Statute":

1. The language "any other part of an aborted fetus" in Section 1.5(b) of the Statute does not apply to:

   (a) placental or umbilical cord blood tissue or cells, or biological material obtained from such blood, tissue or cells;

   (b) fetal cell lines including but not limited to HEK293 (or biological material obtained from such cell lines) derived from the cells of an aborted fetus, but which do not contain cells which were originally part of an aborted fetus;

   (c) fetal cells (or biological material obtained from such cells) which were derived from aborted fetal cells, but are not cells which were originally part of an aborted fetus.

[Filing No. 75 at 2.]  As to that representation's clarity, as IU points out, this proposed definition of "any other part" twice includes the term "part of."  This definition is circular, at best, and does little to clarify the types of materials that are encompassed within the term's reach.  Defendants respond that this does not constitute an attempt at defining the statutory term, but instead "[t]hat statement was merely an attempt to narrow the issues *in this case* by addressing Plaintiffs' conduct that is not at issue in this lawsuit."  [Filing No. 81 at 45.]  However, this statement unequivocally indicates that certain conduct is "not prohibited by the Statute," and that "[t]he language 'any other part of an aborted fetus' in Section 1.5(b) of the Statute does not apply to" certain materials.  [Filing No. 75 at 2.]  It is difficult to read Defendants' statement as anything other than a general statement of the law.  At a minimum, it identifies what Defendants consider to be a likely or plausible reading of the statutory term.[2]

And in their briefing on the cross-motions for summary judgment, Defendants suggest several different definitions of the term "any other part."  At one point, they argue that "[o]nce the cells separate from the fetal tissue, grow, divide into new cells, and are moved from the 'first dish' to the 'second dish,' they can no longer be considered 'part' of the aborted fetus because, as a practical matter, it is impossible to prove that the subculture contains 'part' of a fetus."  [Filing No. 81 at 48.]  In other words, cell cultures that have undergone their first passage, and/or primary cell lines, cannot be considered "part of" a fetus.  Immediately after proffering this definition, however, Defendants suggest that after cells are dissociated—a step even before the first passage

---

[2] The question before this Court is not how a particular prosecutor will choose to exercise his or her discretion in enforcing the statute. The suggestion that the term "any other part" could mean one thing when applied to IU, but something else in another context or as applied to a different entity or individual, is problematic as a matter of potentially arbitrary enforcement.  This issue is discussed in more detail below.

in the cell culture process—the material may be sufficiently "different" from fetal tissue to avoid falling within the scope of the term "any other part." [Filing No. 81 at 48.]

With those two definitions, Defendants attempt to draw a line somewhere within the cell culturing process: before a certain point, materials are encompassed within the term "any other part," and after that point, they are not. Defendants' arguments illustrate the vagueness of the statute in two ways. First, none of Defendants' proposed definitions (including that materials larger than a cell are not covered) are evident from the text of the statute, or from any other legislative source identified by Defendants. It seems unlikely that a person of ordinary intelligence could divine the line being drawn by Defendants as to what is included within the term, particularly when it involves some knowledge of the particulars of the scientific methods used in cell culturing. Second, that line is a moving target within Defendants' own representations. Given that Defendants have not been able to furnish a consistent definition of the term, it is hardly plausible that a person of ordinary intelligence would be able to discern what conduct is prohibited.

The question before this Court is what conduct the statute criminalizes. As both the plain text and Defendants' shifting statutory descriptions illustrate, the statute itself simply does not define with sufficient clarity what materials fall within the definition of the term "any other part."

### b. Acquires, Receives, or Transfers

Subsection (d) of the statute specifies that "[a] person who intentionally acquires, receives, sells, or transfers fetal tissue commits unlawful transfer of fetal tissue, a Level 5 felony." Ind. Code § 35-46-5-1.5(d). IU argues that the term "transfer" is unconstitutionally vague because it fails to provide adequate notice as to what activity is prohibited. [Filing No. 78 at 42.] IU points to a variety of its typical research practices that it argues may or may not be included within the term "transfer," such as collaborations with other researchers, both internally and externally to IU,

14

providing samples to the NIH when required under the terms of an applicable grant, and moving materials among different facilities.  [Filing No. 84 at 47.]  Defendants respond that the term "transfer" is not vague, because its meaning is readily ascertainable.  [Filing No. 81 at 25-26.] Defendants argue that the terms "acquire," "sell," and "receive"—which precede "transfer" within the statute—all "involve transfer of possession or ownership."  [Filing No. 81 at 26.]  Therefore, Defendants contend, the statutory meaning of "transfer" is a "change of possession or ownership." [Filing No. 81 at 47.]

The Court need not delve into the question of whether the term "transfer" clearly means a "change of possession or ownership," as argued by Defendants.  Even if it does, that definition would do little to clarify what activities are prohibited by the statute, given a plain-meaning reading of the term "possession".  *See e.g.,* Oxford English Dictionary, available at www.oed.com, (possession is "the action or fact of holding something (material or immaterial) as one's own or in one's control"); Merriam-Webster, available at www.merriam-webster.com, (possession is "the act of having or taking control"); Black's Law Dictionary 1006 (9th ed. 2009) (possession is "[t]he fact of having or holding property in one's power; the exercise of dominion over property").  For example, does it constitute a change of possession for one IU employee to place a vial of fetal tissue into the hands or onto the work station of another employee?  By a commonsense reading of the word "possession," it would appear so: possession would pass from the first individual to the second, even if IU "owned" the fetal tissue throughout that transaction.

Yet, in their Statement of Defenses, Defendants stated that the following conduct "is not prohibited by the Statute":

2.   The word "transfer" in Section 1.5(b) of the Statute does not apply to physical movement of cells or biological materials received, generated or stored at Indiana University before the enactment of the Statute provided that:

    (a)   the physical movement is within or among laboratories, buildings or physical facilities of Indiana University by any faculty member, employee, representative or agent of Indiana University;

    (b)   the physical movement is the result of a faculty member, employee, representative or agent of Indiana University permanently removing such materials from Indiana University's buildings or physical facilities; or

    (c)   the physical movement is at the request of the National Institute of Health ("NIH") or pursuant to the terms or conditions of any NIH grant.

[Filing No. 75 at 2.]  And in their briefing here, Defendants state in a footnote that "[m]ovement of IU's fetal tissue by IU's employees and agents does not result in a change in ownership or possession of fetal tissue." [Filing No. 90 at 16.]  Defendants' proposed readings of the statute are not clear from the text itself, and they require that the Court overlook a commonsense use of the term "possession"—a word that Defendants themselves graft onto the statute.[3]

As a final illustration of the statute's lack of precision, the Court notes another statutory provision that was amended in the same enactment, as part of HEA 1337, also relating to the treatment of aborted fetal tissue.  Chapter 3 of Indiana Code Section 16-34 is entitled "Treatment of Aborted Remains."  A subsection of that Chapter, Ind. Code § 16-34-3-2(a), permits a woman to determine the final disposition of aborted fetal tissue—including having that tissue "discharged

---

[3] Defendants attempt to avoid this conclusion by arguing that the principles of agency law are imported into the statute, such that any action taken by an IU employee is imputed only to the organization.  Therefore, no "transfers" may ever occur internally.  Defendants provide no explanation as to why a criminal statute, which must be understandable to a person of ordinary intelligence, implicitly incorporates the unrelated principles of civil agency law.  This interpretation stretches any possible reading of the statute beyond its breaking point.

from the abortion clinic" with her.  Ind. Code § 16-34-3-2(b).  No other constraints are placed upon the woman's disposition of that fetal tissue after she receives it, raising obvious questions as to how the instant statute's prohibitions would apply to the handling of that tissue.[4]  Moreover, the Court notes another way in which an individual may lawfully come to "possess" aborted fetal tissue—as the result of a medical abortion, in which an abortion-inducing drug is legally dispensed to a patient, and the abortion occurs outside of a health care facility.  *See* Ind. Code § 16-34-2-1. By Defendants' own statutory reading, an individual disposing of that tissue would "transfer" it, in that the transferor would relinquish her possession of the tissue.  In other words, by Defendants' own proposed readings, the statute appears to potentially criminalize behavior which is explicitly permitted by another statute.

The Court concludes that a person of ordinary intelligence could not determine what constitutes a "transfer" of fetal tissue.  Reading this statute in conjunction with other relevant provisions compounds the statute's vagueness, and Defendants' representations as to the statutory meaning do the same.  For the same reasons, the Court must also conclude that the statutory terms "acquire" and "receive" are equally vague.  Those terms are likewise not defined by the statute, and encompass the same sprawling universe of conduct as "transfer."  Therefore, the Court concludes that the terms "transfer," "acquire," and "receive" as used in Ind. Code § 35-46-5-1.5 are unconstitutionally vague.

### 3. Risk of Arbitrary and Discriminatory Enforcement

A statute found deficient on the basis of one aspect in the void-for-vagueness analysis violates the requirements of the Due Process Clause.  The Court, however, proceeds to analyze the

---

[4] Indiana law regulates how health care facilities handle medical waste disposal, but it does not regulate how private citizens handle medical waste.  *See, e.g.,* Ind. Code §§ 16-41-16-4, 16-41-16-5, 16-41-16-7.

statute with regard to the second aspect as well: whether the statute encourages arbitrary and discriminatory enforcement.  IU argues that the same provisions are void for vagueness because the statute "subjects them to the shifting whims of elected prosecutors who may interpret the Statute one way yesterday and then abandon that construction today."  [Filing No. 84 at 45.] Defendants respond that the statute's scienter requirement assures that the statute will not be subject to arbitrary enforcement.  [Filing No. 90 at 18.]

As the Court discussed above, the statute's failure to define key terms, such as "any other part," requires an enforcer—such as a prosecutor—to develop his own definition.  The definitions proposed by Defendants here illustrate to the Court that the statute allows for arbitrary and discriminatory enforcement.  Defendants, for example, propose that, as applied to IU, the term "any other part" excludes (1) fetal cell lines derived from the cells of an aborted fetus, but which "do not contain cells which were originally part of an aborted fetus"; and (2) fetal cells or biological material obtained from such cells, but that are not cells which were "originally part of an aborted fetus."  [Filing No. 75 at 2.]  These definitions are circular, as they include the very term "part of" that they propose to define, leaving Defendants able to define the prohibited conduct in differing manners as applied to different individuals.  Moreover, by Defendants' own representations here, these definitions were developed based upon, and are limited only by, Defendants' own disputed "scientific evidence."  [*See* Filing No. 90 at 17-18.]

Defendants argue, however, that because the statute criminalizes only the intentional acquisition, receipt, transfer, or sale of fetal tissue, it does not encourage arbitrary enforcement. [Filing No. 81 at 25.]  Defendants contend that (1) "as a practical matter, proving beyond a reasonable doubt that nucleic acids or molecules were part of an aborted fetus and are intentionally being transferred would be a herculean feat," [Filing No. 90 at 18]; and (2) "a person who is

18

intentionally acquiring, receiving, or selling something that the person *does not know is fetal tissue* does not violate the statute," [Filing No. 81 at 25].  Regarding Defendants' first argument, the fact that an element of the statute might be "difficult to prove" does not lessen the risk of arbitrary or discriminatory enforcement.  The void-for-vagueness inquiry focuses not on the likelihood of *conviction*, but whether an individual can discern what conduct is prohibited, and tailor his conduct so as to stay within the confines of the law.

Second, the statute's *mens rea* requirement does little to lessen the risk of arbitrary enforcement.  While Defendants assume that the *mens rea* requirement applies both to the activities involved and whether the material at issue constitutes fetal tissue, the statute is not clear.  It states that "[a] person who intentionally acquires, receives, sells, or transfers fetal tissue commits unlawful transfer of fetal tissue, a Level 5 felony."  Ind. Code § 35-46-5-1.5(d).  The word "intentionally" precedes the verbs, and the statute does not state that the verbs apply only to a substance that an individual *knows* to be fetal tissue.  Moreover, the statute attempts to define "fetal tissue," and Defendants argue that the term indeed has an enforceable definition.  Therefore, by Defendants' own contentions, an individual's *belief* about the substance he is transferring—his subjective assessment of whether it constitutes fetal tissue or not—is irrelevant.  In other words, a substance either is or is not fetal tissue.  The same is true of the term transfer, which Defendants argue has a clear statutory meaning.  [*See* Filing No. 81 at 26.]

Following Defendants' arguments to their logical conclusion illustrates why the statute's *mens rea* requirement does not render it sufficiently definite.  Defendants themselves point out that BDRL cannot confirm with certainty that the shipments of fetal tissue that IU has received were taken from fetuses that were aborted, as opposed to miscarried.  [Filing No. 81 at 15-16.] Defendants argue that "awareness of a high probability that the thing being obtained or conveyed

is part of an aborted fetus is not sufficient" to satisfy the statutory requirement of acting "intentionally." [Filing No. 90 at 18.]  Therefore, by their own argument, Defendants should agree that *none* of IU's conduct falls within the purview of the statute—IU cannot be said to "intentionally" acquire fetal tissue, even from BDRL.  Defendants maintain, however, that IU's receipt/acquisition of shipments of tissue from BDRL violate the statute.  [*See, e.g.,* Filing No. 81 at 46.]  Defendants' own strained and confusing argument demonstrates the problematic enforcement potential of the statute.

The Court concludes that the statute as written allows for arbitrary and discriminatory enforcement, and therefore fails the second aspect of the void-for-vagueness inquiry, in addition the failing the first.

### 4. Standing

In their Reply briefing, Defendants for the first time raise the argument that IU lacks standing to challenge certain portions of the statute, because the issues raised are not ripe for the Court's review.  [Filing No. 90 at 16.]  Specifically, Defendants appear to argue that two issues are unripe: (1) "whether the statute prohibits the mere physical movement of aborted fetal tissue from place to place without a change in possession or ownership," [Filing No. 90 at 16]; and (2) whether the term "any other part…could be defined to include infinitesimally small subdivisions of matter that was included in a fetus," [Filing No. 90 at 17].  In both instances, Defendants argue that IU has not been threatened with prosecution on those particular bases, so IU lacks standing to bring a challenge.  [Filing No. 90 at 16-17.]

"When contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights."  *Babbitt v. United Farm Workers*

*Nat. Union*, 442 U.S. 289, 298 (1979).  Instead, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.*  Pre-enforcement challenges are well established to fall within Article III cases or controversies.  *See Center for Individual Freedom v. Madigan,* 697 F.3d 464, 473 (7th Cir. 2012).  But "[w]hen plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." *Id.* at 298-99.

Here, IU has alleged a plausible threat of prosecution under the statute.  Defendants, for example, repeatedly state in their briefing that IU has violated the statute.  [*See, e.g.,* Filing No. 90 at 13 ("And the evidence shows that IU and Dr. Lahiri violate the Statute when they acquire and receive (that is, they "get") aborted fetal tissue from the Birth Defects Research Laboratory.").]  This is sufficient to confer standing on IU.  Defendants have cited no authority to support the assertion that once a plaintiff has demonstrated standing to challenge a statute, it may only challenge that statute under certain theories of liability or possible enforcement strategies.  The Court concludes that IU has demonstrated that the issue of the statute's vagueness is ripe for review.

In sum, the Court concludes that Ind. Code § 35-46-5-1.5 violates the Due Process Clause of the United States Constitution, because it both fails to provide adequate notice as to what conduct is prohibited, and because it is written in a manner that could encourage arbitrary and discriminatory enforcement.

*5. Remedy*

Defendants argue that this Court may only uphold a facial change if the statute "is impermissibly vague *in all of its applications*," and, as noted above, that some of IU's conduct violates the statute. [Filing No. 81 at 46 (emphasis in original).] However, the Supreme Court has clearly stated otherwise:

> In all events, although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an 'unjust or unreasonable rate' void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. [*U.S. v. L. Cohen Grocery Co.,* 255 U.S. 81, 89 (1921).] We have similarly deemed void for vagueness a law prohibiting people on sidewalks from 'conduct[ing] themselves in a manner annoying to persons passing by'—even though spitting in someone's face would surely be annoying. *Coates v. Cincinnati,* 402 U.S. 611 (1971).

*Johnson,* 135 S. Ct. at 2560-61 (emphasis in original). The *Johnson* court specifically rejected the defendant's argument that the existence of *some* constitutionally valid application of the law established the law's constitutionality, and this Court does the same. *Id.* at 2561. The existence of some constitutionally valid application of the statute, if one exists, does not preclude a constitutional challenge by IU.

Defendants also contend that, in the event that the Court finds that the statute violates the Constitution, the Court should limit its remedy to invalidating only those portions of the statute that it determines implicate constitutionally protected conduct. [Filing No. 90 at 44.] Indiana Code provisions are generally severable, *see* Ind. Code § 1-1-18, so the Court invalidates only those portions of the statute that it has determined are facially unconstitutional.

The Court, therefore, grants in part IU's Motion for Summary Judgment, [Filing No. 77], to the extent that it determines that the below-indicated portions of the statute are void for

vagueness.  As indicated by strikethrough below, the following text from Ind. Code § 35-46-5-1.5

is determined to be void for vagueness, and is excised from the statute as follows:

> (a) As used in this section, 'aborted' means the termination of human pregnancy
> with an intention other than to produce a live birth or to remove a dead fetus. The
> term includes abortions by surgical procedures and by abortion inducing drugs.
> (b) As used in this section, 'fetal tissue' includes tissue, organs, ~~or any other part~~
> of an aborted fetus.
> (c) This section does not apply to the proper medical disposal of fetal tissue.
> (d) A person who intentionally ~~acquires, receives,~~ sells, ~~or transfers~~ fetal tissue
> commits unlawful transfer of fetal tissue, a Level 5 felony.
> (e) A person may not alter the timing, method, or procedure used to terminate a
> pregnancy for the purpose of obtaining or collecting fetal tissue. A person who
> violates this subsection commits the unlawful collection of fetal tissue, a Level 5
> felony.

**B. Dormant Commerce Clause**

IU also challenges the statute as unconstitutional under the dormant Commerce Clause,

arguing that it cannot survive any level of scrutiny that could be applied by the Court.  [Filing No.

78 at 23.]  Defendants disagree, contending that the statute is constitutional under all levels of

scrutiny.  [Filing No. 81 at 28.]

The Commerce Clause of the U.S. Constitution empowers Congress to regulate commerce

"among the several States."  U.S. Const. art. I, § 8, cl. 3; *see Legato Vapors, LLC v. Cook*, 847

F.3d 825, 829 (7th Cir. 2017) (citing *Gibbons v. Ogden*, 22 U.S. 1 (1824) and *Willson v. Black

Bird Creek Marsh Co.*, 27 U.S. 245 (1829)).  Since before the Civil War, it has been settled that

the Commerce Clause also has an implicit "dormant" dimension: that is, in addition to granting

powers to Congress, it also "limits the power of the States to erect barriers against interstate trade."

*Legato Vapors*, 847 F.3d at 829 (citing *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35

(1980)).  "In essence, the 'negative' or 'dormant' aspect of the Commerce Clause prohibits States

from   advancing   their   own   commercial   interests   by   curtailing   the   movement

of articles of commerce, either into or out of the state." *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,

63 F.3d 652, 657 (7th Cir. 1995).   This doctrine "is driven by a concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *McBurney v. Young*, 569 U.S. 221, 235 (2013) (internal citations and quotations omitted).

### 1. Article of Commerce

Defendants argue that, as a threshold matter, the Commerce Clause is not implicated by Ind. Code § 35-46-5-1.5, because the subject of the statute—fetal tissue—is not an article of commerce.  [Filing No. 81 at 28.]  Defendants argue that because IU does not pay for fetal tissue—they pay only for the shipping and handling costs associated with its provision—the statute does not "affect commerce."  [Filing No. 81 at 29.]  IU responds that the term "interstate commerce" is defined more broadly than Defendants suggest, and that under Supreme Court precedent, the activities at issue are governed by the Commerce Clause.  [Filing No. 78 at 24.]

In the context of Commerce Clause challenges to federal statutes, the Supreme Court has articulated "three general categories of regulation in which Congress is authorized to engage under its commerce power." *Gonzales*, 545 U.S. at 16.  It can regulate: (1) "the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and (3) "activities that substantially affect interstate commerce." *Id.* at 16-17.  IU contends that the activities at issue here fall within the parameters created by these three categories. [Filing No. 84 at 22.]

Defendants argue that those categories of activities identified by the Supreme Court in the context of federal authority do not apply to determining what constitutes interstate commerce when state action under the dormant Commerce Clause is implicated.  [Filing No. 90 at 23 ("…the Supreme Court did not define 'interstate commerce' in *Gonzales*.  Rather, the Court explained how

24

the Constitution authorizes Congress to *regulate* interstate commerce.") (emphasis in original).] Instead, Defendants point to Black's Law Dictionary as supplying the applicable definition of "interstate commerce." [Filing No. 81 at 29.] They argue that interstate commerce is "[t]rade and other business activities between those located in different states," and that "trade is the business of *buying and selling or bartering* goods or services." [Filing No. 81 at 29 (emphasis in original) (citing Black's Law Dictionary).] Therefore, Defendants argue, because IU does not buy, sell, or barter fetal tissue, it cannot be considered an article of commerce. [Filing No. 81 at 29.]

Defendants offer no explanation as to why the Supreme Court's articulation of the scope of "interstate commerce" in the context of Congress' power under the Commerce Clause would not extend—or at least be instructive—as to the meaning of interstate commerce as it applies to the dormant aspect of the Commerce Clause. The grant of authority to Congress to regulate commerce among the states, and the related limitation on the states' authority to impede that regulation or to stem the flow of interstate activity, are in some sense two sides of the same coin. They are, at a minimum, intertwined in both provenance and scope. As the Supreme Court has explained:

> During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a conflict of commercial regulations, destructive to the harmony of the States, ensued. In his view, this was the immediate cause that led to the forming of a constitutional convention. If there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints.

> We have subsequently endorsed Justice Johnson's appraisal of the central importance of federal control over interstate and foreign commerce and, more narrowly, his conclusion that the Commerce Clause had not only granted Congress express authority to override restrictive and conflicting commercial regulations adopted by the States, but that it also had immediately effected a curtailment of state power. In short, the Commerce Clause even without implementing legislation

25

by Congress is a limitation upon the power of the States.  Our decisions on this point reflect, upon fullest consideration, the course of adjudication unbroken through the Nation's history.

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 571-72 (1997).  This Court sees no basis upon which to conclude that the Supreme Court's articulation of the scope of interstate commerce should apply to one aspect of the Commerce Clause and not the other.

The Court therefore looks to case law to determine the application of the term "interstate commerce," as opposed to Defendants' proposed dictionary definitions.  IU argues that the activities at issue here fall within the categories of activities identified by the Supreme Court, for a multitude of reasons, and therefore constitute interstate commerce.  IU points out that fetal tissue is an item of value that "hospitals, laboratories, researchers, universities, pharmaceutical companies, and others exchange through interstate channels."  [Filing No. 84 at 23.]  The individuals and entities involved in these exchanges are engaged in interstate commerce generally, and in IU's case, fetal tissue is used in research funded by millions of dollars in NIH grants.  [*See, e.g.*, Filing No. 77-3 at 1-8.]

The Seventh Circuit has underscored that in many cases involving the Commerce Clause, courts "have upheld Congress' regulation of materials, which, at first blush, would not strike most as 'commerce' in any technical commercial sense of the word."  *United States v. Black*, 125 F.3d 454, 459 (7th Cir. 1997) (citing *United States v. Bongiorno*, 106 F.3d 1027, 1031 (1st Cir. 1997) (concluding that "[t]he term 'commerce' in the Commerce Clause context is a term of art, and the Court consistently has interpreted it to include transactions that might strike a lay person as 'noncommercial'"); *United States v. Simpson*, 252 U.S. 465, 466 (1920) (finding that transporting whiskey intended for the transporter's personal consumption constituted "commerce"); *Lottery Case* (*Champion v. Ames*), 188 U.S. 321, 354 (1903) (concluding that "commerce" included

carrying lottery tickets)).  In *Black*, the court evaluated whether the Child Support Recovery Act ("CSRA"), which imposed criminal liability for the interstate nonpayment of past-due child support, was permissible under the Commerce Clause.  *Black*, 125 F.3d at 460.  The Court concluded that the conduct addressed by the CSRA fell within the second category of permissible regulations: "[i]t regulates the nonpayment of interstate child support obligations.  Thus, at the very least, the CSRA regulates a 'thing' in interstate commerce..."  *Black*, 125 F.3d at 460.

The payment of child support does not fit within the narrow definition of "interstate commerce" offered by Defendants.  There is no "market" for child support payments, in the sense defined by Defendants—a place "where supply and demand affect the price of a commodity or a place where things are bought and sold."  [Filing No. 90 at 25.]  Child support payments are not fungible commodities, given in exchange for valuable consideration.  The payment or nonpayment of child support is also not trade, in the narrow sense proposed by Defendants.  Nonetheless, the court concluded that the transfer of funds in that context constituted a "thing" in interstate commerce.  The Court concludes the same here.  *See Rutherford v. Am. Med. Ass'n*, 379 F.2d 641, 644 (7th Cir. 1967) ("…regulation under the Commerce Clause is not limited to articles or activities for which there is a transfer for value.") (citations omitted).  As IU highlights, the activity at issue here involves exchanges by hospitals, laboratories, researchers, universities, pharmaceutical companies, and others through interstate channels.  [Filing No. 84 at 23.]  The individuals and entities involved in these exchanges are engaged in interstate commerce generally, and in IU's case, the fetal tissue is used in research funded by multi-million dollar grants.  The Seventh Circuit's and Supreme Court's prior conclusions regarding interstate commerce convince this Court that this is the type of activity encompassed within the Commerce Clause's reach.

Finally, in support of their argument that the transfer of fetal tissue does not constitute "commerce," Defendants point to a federal statute regarding the use of fetal tissue. [Filing No. 90 at 23.] That statute mandates that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce." 42 U.S.C. § 289g-2(a). Defendants interpret this statute as a statement by Congress that the exchange of fetal tissue without consideration does not constitute commerce, and therefore that it is outside of Congress' power to regulate. [Filing No. 90 at 23.] The Court does not so read the statute. In fact, the Court reads that statute to illustrate the opposite: it appears that Congress assumed that fetal tissue could be an article of commerce. The statute therefore specifies that *if* the transfer affects interstate commerce, *then* a person may not receive valuable consideration for it. The fetal tissue shipments from BDRL to IU are consistent with this statutory scheme.

The Court therefore concludes that, at least with regard to the fetal tissue shipments received by IU from BDRL, those transactions constitute interstate commerce.

### 2. Level of Scrutiny

IU first argues that the challenged law constitutes a "direct regulation" on interstate commerce that is *per se* unconstitutional. [Filing No. 78 at 24.] In making this argument, IU hearkens back to an earlier era of dormant Commerce Clause jurisprudence. As described by the Seventh Circuit:

> For many years, dormant Commerce Clause jurisprudence drew a distinction between States' direct and indirect regulation of interstate commerce. Direct interference with interstate commerce was invalid as a violation of the dormant Commerce Clause, but legislation having indirect effects remained permissible. *See, e.g.*, *Di Santo v. Pennsylvania*, 273 U.S. 34, 36-37, 47 (1927) (state law seeking to prevent fraud by requiring state license to sell steamship tickets was invalid as direct regulation of foreign and interstate commerce).

The distinction between direct and indirect regulation proved to be less a bright line and more a matter of degree.  The Supreme Court then began to rely more on a balancing test that weighs the regulating state's interests against the burdens on interstate commerce (at least when the state does not actually discriminate against interstate commerce).  *See Southern Pacific Co. v. Arizona*, 325 U.S. 761, 770-71, 783-84 (1945) (applying balancing test to hold that state law restricting length of interstate trains was invalid burden on interstate commerce); *California v. Thompson*, 313 U.S. 109, 116 (1941) (overruling *Di Santo*); *South Carolina State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 196 (1938) (upholding state limits on size and weight of trucks on state highways).

*Legato Vapors*, 847 F.3d at 829.

Instead of focusing on whether an effect on interstate commerce is direct, these more recent dormant Commerce Clause cases clarify that the threshold question is whether a challenged law is *discriminatory*—either facially or in practical effect—against out-of-state interests.  *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131-32 (7th Cir. 1995).  The Seventh Circuit has repeatedly concluded that state and local laws, for the purposes of a dormant Commerce Clause analysis, may be put into one of three categories: (1) "laws that explicitly discriminate against interstate commerce," which are treated as "all but *per se* unconstitutional"; (2) "laws that appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce"; and (3) "laws that affect commerce without any reallocation among jurisdictions— that do not give local firms any competitive advantage over those located elsewhere."[5]  *Nat'l Paint*, 45 F.3d at 1131-32.

### a. Facially Discriminatory

Therefore, the question of whether the statute regulates commerce "directly" is not the critical one.  Instead, the Court begins by evaluating whether the statute discriminates against interstate commerce.  IU argues that the challenged statute facially discriminates against interstate

---

[5] As the Seventh Circuit has pointed out, the "classification of a particular law may be difficult." *Id.* at 1131.

commerce, falling within the first analytical category, and is therefore *per se* unconstitutional. [Filing No. 78 at 24.]  IU contends that the statute "builds a wall around Indiana and prohibits tissue from an aborted fetus from entering or exiting the state." [Filing No. 78 at 24.]  Defendants disagree, arguing that the statute does not facially discriminate against out-of-state interests, because "everyone in Indiana is equally prohibited from acquiring receiving, selling, or transferring aborted fetal tissue, regardless of the source." [Filing No. 81 at 30.]  Defendants point out that "[n]othing in the Statute prohibits a person from entering or exiting Indiana with aborted fetal tissue." [Filing No. 81 at 31.]

The Court agrees that the statute does not on its face discriminate against out-of-state interests.  By its terms, the statute prohibits the transfer, acquisition, receipt, and sale of fetal tissue, without reference to whether the source of the tissue or the transferor is located outside the state of Indiana.  And contrary to IU's assertion, the statute does not impose an outright ban on fetal tissue entering the state: it specifically prohibits only the transfer, receipt, acquisition, or sale of fetal tissue.  IU points out that a statutory loophole that large would be "illogical," arguing that "[s]urely Defendants cannot mean that IU Plaintiffs may retrieve the fetal tissue samples on the other side of the State's border, drive them back to Marion and Monroe Counties, and conduct research with them without offending the statute." [Filing No. 84 at 26.]  But that appears to be precisely what the statute permits.  Because the statute does not facially discriminate against interstate commerce, the Court concludes that it does not fall within the first analytical category.

b. Discriminatory Effect

In the second category are laws that are facially non-discriminatory, but that have a discriminatory effect on interstate commerce.  *See, e.g., Park Pet Shop*, 872 F.3d at 501; *Nat'l Paint*, 45 F.3d at 1121.  This category is further subdivided into two groups.  The first subgroup

involves laws from which the discriminatory effect "is powerful, acting as an embargo on interstate commerce without hindering intrastate sales." *Park Pet Shop*, 872 F.3d at 501. These laws are "treated as the equivalent of a facially discriminatory statute," *id.*, and are subject to strict scrutiny review under which the state must establish that the state's legitimate interests cannot be "adequately served by nondiscriminatory alternatives," *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1279 (7th Cir. 1992). The second subgroup encompasses laws that exert only an "incidental effect" on interstate commerce, and these are subject to what is known as the *Pike* balancing test. *Park Pet Shop*, 872 F.3d at 501. Under that test, a law that has incidental effects on interstate commerce is valid "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

There is "no clear line separating the category of state regulation that is virtually per se invalid and the category subject to the *Pike* test." *Solid Wastes*, 63 F.3d at 657. In distinguishing between the two types of laws in this second category, "the critical consideration is the *overall* effect of the statute on both local and interstate activity, and whether the effect is to favor in-state economic interests over out-of-state economic interests." *Gov't Suppliers*, 975 F.3d at 1278 (emphasis in original) (citing *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 579 (1986)). Furthermore, "when considering the purpose of a challenged statute, the Court is not bound by the name, description or characterization given it by the legislature or the courts of the State, but will determine for itself the practical impact of the law." *Gov't Suppliers*, 975 F.3d at 1278 (citing *Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979)).

IU argues for the application of strict scrutiny, but contends that even under *Pike* balancing, the law runs afoul of the dormant Commerce Clause. [Filing No. 78 at 25-33.] Defendants argue that *Pike* balancing should apply. [Filing No. 81 at 30-37; Filing No. 90 at 26-32.] The question

of which test applies—strict scrutiny or *Pike* balancing—is a fact-specific inquiry.  *See Gov't Suppliers*, 975 F.3d at 1278.  The Court must determine the overall effect of the statute on both local and interstate activity, and then determine whether that effect is to favor in-state over out-of-state interests.  *Id.*

Here, however, the Court hits a barrier that has been described in great detail.  Quite simply, the vagueness of the statutory language leaves the Court unable to determine what conduct the statute governs.  While the parties agree that the statute encompasses the shipment of fetal tissue from BDRL to IU, they do not agree, for example, as to whether the statute applies to fetal cells or fetal cell lines.  IU has presented evidence that many researchers conduct research using fetal cell lines, some of which IU procures from commercial suppliers.  [Filing No. 77-1 at 4; Filing No. 77-2 at 2-3.]  And the VPF generates cell lines using fetal cells, which it acquires from commercial sources.  [Filing No. 77-2 at 2-3.]

The overall impact of all possibly relevant conduct is impossible for the Court to define or measure without being able to determine the parameters of the regulated conduct.  And without being able to define or measure the degree of regulation, the Court cannot determine its impact on either intrastate or interstate commerce.  Therefore, the Court simply cannot determine what framework applies to evaluate the statute in the context of the dormant Commerce Clause.  Even if the Court could determine what framework applied, the same roadblock would arise again: in the event that *Pike* balancing applied, the Court would be equally unable to weigh the statute's impact.  *See, e.g., Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008) ("It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits."); *see also Nat'l Paint*, 45 F.3d at 1130; *Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009).

Because the statute's vagueness precludes the Court's review on this issue, the parties' motions for summary judgment as to the dormant Commerce Clause are denied.[6]  [Filing No. 77; Filing No. 79.]

### C. Takings Clause

IU contends that Ind. Code § 35-46-5-1.5 also violates the Takings Clause of the Fifth Amendment, in that it authorizes the taking of IU's property without just compensation.  [Filing No. 78 at 43-44.]  IU contends that the statute interferes with IU's protected property interests in (1) the products of its research; (2) its grant agreements with the NIH; and (3) Dr. Lahiri's tenured employment at IU.  [Filing No. 84 at 51.]  Defendants raise multiple challenges to the particular property interests identified by IU: that several of them do not constitute "private" property because they are owned by IU, a body politic, [Filing No. 81 at 50]; and that IU has not identified with sufficient detail what property interests are at stake, [Filing No. 90 at 38].  Defendants also contend that the statute does not constitute a taking of that property, because (1) miscarried fetal tissue is a viable alternative to aborted tissue, so IU can continue its research, [Filing No. 81 at 52]; (2) the statute's effect on IU is only incidental, [Filing No. 81 at 54]; (3) many of the materials identified by IU are not "fetal tissue" under the statute, [Filing No. 90 at 40]; and (4) if there is a taking, it is not being done for the public benefit, [Filing No. 90 at 41].

Takings claims present in four basic forms: "permanent physical invasion, deprivation of all beneficial economic use, exactions, and partial regulatory takings." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1073-74 (7th Cir. 2013) (citing *Lingle v. Chevron, U.S.A., Inc.,* 544

---

[6] The Court need not conduct an analysis of the portions of the statute that remain following the Court's void-for-vagueness analysis, because IU does not challenge the portions of the statute pertaining to the sale of fetal tissue.

U.S. 528, 538-39 (2005)).  IU raises a partial regulatory taking claim here, which is evaluated in accordance with *Pennsylvania Central Transportation Co. v. City of New York,* 438 U.S. 104 (1978), and its progeny.  "A court applying *Penn Central* considers several factors to determine whether a diminution in value amounts to a taking: (1) the nature of the government action, (2) the economic impact of the regulation, and (3) the degree of interference with the owner's reasonable investment-based expectations." *Goodpaster,* 736 F.3d 1074.  These factors do not "provide a set formula for determining whether a taking has occurred, but rather are designed to bar Government from forcing some people alone to bear public burdens which, in fairness and justice, should be borne by the public as a whole...." *Goodpaster,* 736 F.3d 1074 (internal quotations and citation omitted).  This inquiry evaluates "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle,* 544 U.S. at 540.

The parties agree that the regulatory takings analysis is an "ad hoc factual inquir[y]" that depends "largely upon the particular circumstances" of the case.  *Penn Central,* 438 U.S. at 124. But in attempting to embark upon this factual inquiry, the Court again finds itself in the position of being hampered by the vagueness of the statute itself.  As in the context of the dormant Commerce Clause analysis, the Court again cannot determine the parameters of the conduct regulated by the statute.  While the Court could potentially conduct some analysis as to the first factor—the nature of the government action—the writing is on the wall as to the second and third, the economic impact of the regulation, and the degree of interference with the owner's reasonable investment-based expectations.  Without knowing what material is covered by the statute, and precisely what conduct is prohibited, the Court cannot determine the statute's economic impact and the degree to which it interferes with IU's property interests.

Therefore, the Court denies the parties' motions for summary judgment as to IU's Fifth Amendment takings claim.[7]   [Filing No. 77; Filing No. 79.]

### D. Equal Protection and Equal Privileges and Immunities

IU argues that Ind. Code § 35-46-5-1.5 violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, and the Equal Privileges and Immunities Clause of the Indiana Constitution, in that it discriminates against researchers who acquire and use aborted fetal tissue in their research, but does not apply to researchers who use miscarried fetal tissue.[8] [Filing No. 78 at 34.]   Defendants respond that the statute is rationally related to a legitimate government purpose, and therefore does not violate the Equal Protection Clause.   [Filing No. 81 at 38.]

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The Equal Protection Clause's coverage is triggered "when a regulation draws distinctions among people based on a person's membership in a suspect class or based on a denial of a fundamental right."  *Sweeney v. Pence*, 767 F.3d 654, 668 (7th Cir. 2014) (internal quotation and citation omitted).  "If either a suspect class or fundamental right is implicated, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause.  But if neither condition is present, the proper standard of review is rational basis."  *Id.* (internal quotation and citation omitted).

---

[7] As with the dormant Commerce Clause claim, the Court need not conduct an analysis of the portions of the statute that remain following the Court's void-for-vagueness analysis, because IU does not challenge the portions of the statute pertaining to the sale of fetal tissue.

[8] The parties agree that the same standard applies to both the federal and state claims, so the Equal Protection analysis presented here applies equally to the Equal Privileges and Immunities argument.

The parties agree that neither a suspect class nor a fundamental right is involved, so the rational basis standard of review applies. [Filing No. 78 at 34; Filing No. 81 at 38.] Under rational basis, statutes are "reviewed with considerable deference." *Id.* "The pertinent inquiry is whether the statute in question bears a reasonable relation to any proper legislative purpose. It is not [the Court's] task to discern the specific intent of the legislature, but to determine if any proper legislative purpose is served by Indiana's law." *Id.* (internal quotation and citation omitted). A plaintiff must meet a "heavy burden" in order to succeed on a rational basis challenge. *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000). "Rational basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (internal quotation and citation omitted). In order to establish that no rational basis exists for a statute, a plaintiff must "negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (internal citation omitted). "However, the relationship of the classification to its goal must not be so attenuated as to render the distinction arbitrary or irrational." *Turner*, 207 F.3d at 424 (internal quotation and citations omitted).

Defendants identify three "legitimate" interests that the State could have considered in enacting this statute: (1) "ensuring that research on human tissue is done ethically"; (2) "protecting women from pressure to allow research on aborted fetuses based on misleading representations about the benefits of fetal tissue research"; and (3) "avoiding the creation of demand for aborted fetal tissue." [Filing No. 81 at 38.] The Court concludes that the first—ensuring that research on human tissue is done ethically—is a legitimate governmental interest. *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 731 (1997) ("The State also has an interest in protecting the integrity and ethics of the medical profession.")

IU argues that, even if this were a legitimate governmental interest, this statute is not rationally related to it.  IU contends that because the statute does not apply to research on fetal tissue that is the result of miscarriage, the only basis for "ethical" concerns regarding aborted fetal tissue is the fact that it is aborted.  [Filing No. 84 at 40-41.]  IU argues, citing *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice."  [Filing No. 78 at 35.]  Defendants respond that both parties agree that there is no scientific consensus as to whether the use of aborted fetal tissue is ethical, and that the Indiana legislature is "entitled to legislate based on its own view as to which side is correct."  [Filing No. 81 at 41.]

The Court cannot read the Supreme Court's statement in *Lawrence* as broadly as IU suggests.  Nothing in IU's briefing has convinced the Court that the legislature would be constitutionally barred from making the policy determination that research on aborted fetal tissue is unethical, even if that determination were made solely on the basis that the tissue was available as the result of an abortion.  Such a policy determination has no bearing on a woman's access to abortion, and therefore the long line of cases detailing the constitutional limits on abortion legislation do not directly apply here.  Legislatures do indeed make policy decisions based on ethical and moral determinations, despite the Supreme Court's broad pronouncement in *Lawrence*. For example, Indiana criminalizes various forms of obscene and pornographic materials and performances—undoubtedly the result of the legislature's ethical determinations as to the value of those materials.  *See* Ind. Code § 35-49 (Obscenity and Pornography).  If the legislature's intent were to ensure ethical research using human tissue, and it determined that the use of aborted fetal tissue was unethical, this statute would be rationally related to that purpose.

Of course, the Court must agree with IU that if this were indeed the legislature's goal, this statute was neither the most direct nor the least restrictive means to accomplish it: it does not mention research at all, instead only regulating the movement of the fetal tissue encompassed by the statute. But the rational basis inquiry does not require that a statute be the wisest, fairest, most logical, or least restrictive means to any end. *See Turner*, 207 F.3d at 424. It need only be rationally related to a legitimate purpose. And this statute clears that low threshold.

Therefore, the Court grants Defendants' Motion for Summary Judgment, [Filing No. 79], and denies IU's Motion for Summary Judgment, [Filing No. 77], as to this claim.[9]

### E. First Amendment

Finally, IU contends that Ind. Code § 35-46-5-1.5 is unconstitutional because it abridges IU's right to academic freedom. [Filing No. 78 at 47.] IU contends that the statute prohibits and criminalizes its research using fetal tissue, and renders it unable to "effectively teach [its] students about fetal tissue research if [it] is unable to accompany that instruction with hands-on application." [Filing No. 78 at 48.] Defendants respond that the statute does not itself prohibit any expressive activities, and that any burdens on IU are too remote and attenuated to constitute a violation of the First Amendment. [Filing No. 81 at 57.]

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1274 (7th Cir. 1982) (citing *University of California Regents v. Bakke*, 438 U.S. 265, 312 (1978)). "Academic freedom prohibits state actions that 'cast a pall of orthodoxy over the classroom,' which is traditionally the 'marketplace of ideas.'" *Keen v. Penson*, 970 F.2d 252, 257

---

[9] Again with this claim, because IU does not challenge the portions of the statute pertaining to the the sale of fetal tissue, the Court need not conduct an Equal Protection analysis of the portions of statute that remain following the void-for-vagueness determination.

(7th Cir. 1992) (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).  As the Seventh Circuit noted thirty-five years ago, "[c]ase law considering the standard to be applied where the issue is academic freedom of the university to be free of governmental interference, as opposed to academic freedom of the individual teacher to be free of restraints from the university administration, is surprisingly sparse." *Dow Chem. Co.*, 672 F.2d at 1274.  Though more than a few years have passed since that observation, it remains true today.

IU argues that "[t]he statute prevents IU Plaintiffs from actively participating in research and scholarship using fetal tissue." [Filing No. 78 at 48.]  IU essentially argues that the statute runs afoul of the First Amendment through the following chain: IU may not conduct research on aborted fetal tissue (because, among other issues, it cannot refresh its supply of fetal tissue, and the statute prohibits internal transfers within the university, which would naturally occur during the course of research).  Therefore, IU is left unable to teach its students about the specific process of performing experimentation on aborted fetal tissue, cannot teach its students about the results of experimentation that it was unable to conduct, and cannot publish that research.  In other words, it cannot disseminate information that it does not have.

Assuming for the moment that the statute prohibits IU from conducting research on aborted fetal tissue, that prohibition applies to specific conduct: performing research.  In its briefing here, IU has not established that research is itself expressive conduct to which the First Amendment applies.  Instead, IU argues that the consequence of that prohibition—depriving it of information it would otherwise have to convey—is offensive to the First Amendment.  The Court is sensitive to the argument that the prohibition of a specific type of research could be seen to cast "a pall of orthodoxy over the classroom." *Keen*, 970 F.2d at 257.  But, on the other hand, Defendants' point

is well-taken that almost any criminal statute could be seen as prohibiting a certain variety of research in which a person could want to engage.

The parties devote limited attention to the First Amendment challenge—not surprising, given that it is the last of five separate constitutional arguments, which span hundreds of pages of briefing, and hundreds more in exhibits.  IU has not presented an analogous scenario that would support the Court's adoption of its view of First Amendment freedoms in the academic context—that is, that the First Amendment prevents states from enacting statutes prohibiting conduct in which the University would like to engage, and then teach about.

Therefore, the Court grants Defendants' Motion for Summary Judgment, [Filing No. 79], and denies IU's Motion for Summary Judgment, [Filing No. 77], as to this claim.[10]

## IV.
### CONCLUSION

For the reasons described above, the Court resolves the cross-motions for summary judgment as follows:

- The Court **GRANTS IN PART** IU's Motion for Summary Judgment, [Filing No. 77], as to IU's Due Process Clause claim, to the extent that the Court determines that the text indicated by strikethrough below is unconstitutionally vague, and Defendants are permanently enjoined from enforcing those portions:

  (a) As used in this section, 'aborted' means the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus. The term includes abortions by surgical procedures and by abortion inducing drugs.
  (b) As used in this section, 'fetal tissue' includes tissue, organs, ~~or any other part~~ of an aborted fetus.
  (c) This section does not apply to the proper medical disposal of fetal tissue.
  (d) A person who intentionally ~~acquires, receives,~~ sells, ~~or transfers~~ fetal tissue commits unlawful transfer of fetal tissue, a Level 5 felony.
  (e) A person may not alter the timing, method, or procedure used to terminate a pregnancy for the purpose of obtaining or collecting fetal tissue. A person who

---

[10] Again with this claim, because IU does not challenge the portions of the statute pertaining to the the sale of fetal tissue, the Court need not conduct a First Amendment analysis of the portions of statute that remain following the void-for-vagueness determination.

violates this subsection commits the unlawful collection of fetal tissue, a Level 5 felony.

• The Court **DENIES** the parties' motions for summary judgment, [Filing No. 77; Filing No. 79], as to the dormant Commerce Clause and Takings Clause claims;

• The Court **GRANTS** Defendants' Motion for Summary Judgment, [Filing No. 79], as to the Equal Protection and First Amendment claims, and **DENIES** IU's Motion for Summary Judgment, [Filing No. 77], as to those claims.

Having concluded that the motions for summary judgment can be resolved without oral argument, the Court **DENIES AS MOOT** Defendants' Motion for Oral Argument, [Filing No. 80].

The Court requests that the Magistrate Judge confer with the parties at her earliest convenience to ascertain whether the parties believe that after this Order further proceedings are necessary, or whether final judgment may issue.

Date: 12/22/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Stephanie L. Boxell
FAEGRE BAKER DANIELS LLP (Indianapolis)
stephanie.boxell@faegrebd.com

John J. Bursch
BURSCH LAW PLLC
jbursch@burschlaw.com

Anthony Scott Chinn
FAEGRE BAKER DANIELS LLP (Indianapolis)
scott.chinn@faegrebd.com

Kevin G. Dougherty
WARNER NORCROSS & JUDD LLP
kdougherty@wnj.com

Raegan Mackenzie Gibson
PAGANELLI LAW GROUP
raegan@paganelligroup.com

Fred Anthony Paganelli
PAGANELLI LAW GROUP
tony@tonypaganelli.com

Anne Kramer Ricchiuto
FAEGRE BAKER DANIELS LLP (Indianapolis)
anne.ricchiuto@FaegreBD.com